971 A.2d 1087 (2009)
407 N.J. Super. 464
ST. GEORGE'S DRAGONS, L.P., Plaintiff-Respondent/Cross-Appellant,
v.
NEWPORT REAL ESTATE GROUP, L.L.C., Defendant-Appellant/Cross-Respondent,
J. Nazmiyal, Inc., Defendant-Respondent/Cross-Appellant, and
Brothers Commercial Brokerage, Inc. and Pivnick Realty Group, Inc., Defendants-Respondents.
St. George's Dragons, L.P., Plaintiff-Appellant/Cross-Respondent,
v.
Newport Real Estate Group, L.L.C., Defendant-Respondent,
J. Nazmiyal, Inc., Defendant-Respondent/Cross-Appellant, and
Brothers Commercial Brokerage, Inc. and Pivnick Realty Group, Inc., Defendants-Respondents.
Nos. A-5779-06T1, A-6115-06T1.
Superior Court of New Jersey, Appellate Division.
Argued February 23, 2009.
Decided June 3, 2009.
*1089 Alan M. Lebensfeld, Red Bank, argued the cause for appellant/cross-respondent Newport Real Estate Group in A-5779-06T1 and respondent in A-6115-06T1 (Lebensfeld Borker Sussman & Sharon, L.L.P., attorneys; Mr. Lebensfeld and Michele A. Querques, of counsel; Mr. Lebensfeld, on the brief).
Mark A. Slama, New Brunswick, argued the cause appellant/cross-respondent St. George's Dragons in A-6115-06T1 and respondent/cross-appellant in A-5779-06T1 (Windels, Marx, Lane & Mittendorf, L.L.P., attorneys; Mr. Slama and Douglas A. Stevinson, on the brief).
Jay D. Rubenstein and Stuart Reiser, Hackensack, argued the cause for respondent/cross-appellant J. Nazmiyal, Inc. (Shapiro & Croland, attorneys; Bruce J. Ackerman, of counsel; Mr. Rubenstein and Mr. Reiser, on the brief).
John L. Bonello, Long Branch, argued the cause for respondent Brothers Commercial *1090 Brokerage, Inc. (Manna & Bonello, attorneys; Mr. Bonello, on the brief).
Himelman & Himelman, Red Bank, for respondent Pivnick Realty Group, Inc., join in the brief of respondent/cross-appellant J. Nazmiyal, Inc.
Before Judges REISNER, SAPP-PETERSON and ALVAREZ.
The opinion of the court was delivered by
REISNER, J.A.D.
These appeals, which we have consolidated for purposes of this opinion, concern a July 5, 2007 order entered by the Chancery Division, following a bench trial. The appeals present the question of whether J. Nazmiyal, Inc., a corporation wholly-owned by Jason Nazmiyal (Nazmiyal[1]), properly exercised a right of first refusal to purchase a commercial building located at 12 Broad Street in Red Bank. The first-refusal clause was contained in Nazmiyal's lease with St. George's Dragons, L.P. (St. George), the owner of the property. The clause provided as follows:
[I]f the Landlord at any time during the term of this Lease receives one or more bona fide offers from third parties to purchase the demised premises or property... and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the Offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration contained in the bona fide offer.
The trial court found that Nazmiyal properly exercised the right of first refusal and ordered specific performance. Both St. George and Newport Real Estate Group, L.C.C. (Newport), another St. George tenant, whose third-party offer Nazmiyal claimed to have matched, appeal from those determinations. In addition, St. George appeals from the court's ruling that St. George was responsible for the $225,000 commission due to Brothers Commercial Brokerage, Inc., whose principal, Geoffrey Brothers (Brothers), was St. George's real estate broker on both the lease and the sale. The court also enforced Brothers' obligation, memorialized in the lease, to share the commission on a fifty-fifty basis with the Pivnick Realty, Group, Inc., whose principal, David Pivnick (Pivnick), had introduced Nazmiyal to the property.
In a nutshell, this $4.5 million deal fell apart because Nazmiyal and St. George could not agree on which of them was responsible for paying a broker's commission, the claim for which arose from the Nazmiyal-St. George lease. In deciding this issue, the court needed to construe the right of first refusal clause in the lease, as well as the Newport-St. George contract, the terms of which Nazmiyal was required to match in order to invoke the right of first refusal.
According to St. George, the essential purchase term was its receipt of a net sum of $4.375 million. According to Nazmiyal, the essential term was its payment of the gross purchase price of $4.5 million. The trial judge agreed with Nazmiyal, and so do we. Both the right of first refusal and the third-party offer are to be construed using traditional principles of contract interpretation. In this case, we conclude that neither the refusal clause nor the third-party contract guaranteed the owner *1091 a net recovery on the sale or required the buyer to pay brokers' commissions. We therefore affirm.

I
To place the legal issues in context, we review the trial testimony and evidence in some detail.
The original lease was executed on February 18, 2000. Testifying about the negotiation of that agreement, Jason Nazmiyal, whom all parties agreed was a highly experienced real estate investor, recalled that Pivnick acted in a dual capacity as both his agent and St. George's agent. Pivnick, who had previously managed the property for St. George, but also was a friend of Nazmiyal, introduced Nazmiyal to the property, and also drafted the initial version of the lease. According to Nazmiyal, at St. George's request, Pivnick initially inserted a clause requiring Nazmiyal to pay the brokers' commissions if he purchased the property. However, when Nazmiyal's attorney objected to that provision, St. George's managing partner, Thomas Clark, agreed that Pivnick could remove that clause.
According to Nazmiyal, the usual practice in the real estate industry was that the seller was responsible for the brokers' commissions. Nazmiyal's testimony in that regard was corroborated by Geoffrey Brothers, who testified that "[t]ypically it is the seller that pays the [broker's] commission." Thus, Nazmiyal understood that by agreeing to remove the "buyer pays" clause, the seller was agreeing that the usual industry practice would apply. Neither side objected to a provision that any broker commission would be split fifty-fifty between Pivnick and Brothers, who was St. George's then-current leasing agent, and that clause remained in the lease.
Brothers was copied on the lease agreement, and testified that although he had no formal agreement with Pivnick, the fifty-fifty commission split between the brokers was consistent with his separate commission agreement with St. George, and with common practice in the industry.[2] Brothers testified that Clark's later refusal to pay Brothers' five percent commission, and his insistence that Nazmiyal pay Pivnick's share of that commission, were inconsistent with the 1999 agreement between St. George and Brothers.
There was no dispute that on October 12, 2005, St. George and Newport entered into a contract (the Newport contract) pursuant to which Newport would buy the property for $4.5 million, subject to Nazmiyal's right of first refusal. The Newport contract provided that St. George would pay a $125,000 commission to Brothers, whom the contract recited was the only broker involved in that deal; the contract also provided that if either party had dealt with any other broker whose identity that party had not disclosed, the party who had dealt with the undisclosed broker would pay any commission due to that broker.[3]
*1092 As described by Clark, the Newport contract was an "all cash deal" which required the purchaser to close within ten business days. However, Clark denied that those terms were designed to make it more difficult for Nazmiyal to match the offer. Clark also testified that he understood that the Newport contract limited St. George's obligation to pay a broker's commission to the $125,000 recited in the contract. He did not "believe" he had ever promised Brothers or Pivnick that he would "take care of" Pivnick's commission if Nazmiyal bought the property. But, he admitted that in his deposition, he had testified to his understanding that Nazmiyal "had no obligation to pay a broker commission." In response to the judge's question at trial, Clark explained that the "50/50 commissions split on the option called for no one to be responsible." He expected Brothers to split the $125,000 commission with Pivnick. Clark also believed that in the context of the Newport deal, the "price" Nazmiyal had to meet for purposes of the right of first refusal was "$4.375 million," although that number did not appear in the Newport contract.
Clark testified that when the original Nazmiyal lease was negotiated, Pivnick was acting as Nazmiyal's agent in drafting the document. Clark claimed he did not realize that during the negotiations, Pivnick had deleted a provision that would have required Nazmiyal to pay all of the brokers' commissions if he bought the property. However, Clark admitted that he asked another St. George partner, who was a highly sophisticated real estate investor, to review and sign the final version of the lease agreement on behalf of St. George. Clark further admitted that when he signed the lease with Nazmiyal, he understood, based on the pre-existing 1999 brokerage agreement with Brothers, that if Nazmiyal eventually bought the property pursuant to the right of first refusal clause, St. George would owe "a 5 percent commission at the closing to Mr. Brothers."
On October 18, 2005, St. George's counsel presented the Newport contract to Nazmiyal so that the latter could exercise his right of first refusal if he chose to do so. The October 18 letter recited:
The price [Newport] has agreed to pay for the Office Building is $4,500,000 and the terms are memorialized in the fully executed Agreement of Sale which is enclosed herewithall of which terms are a material inducement for Landlord to enter into this Agreement of Sale.
On November 16, 2005, Nazmiyal's counsel Bruce Ackerman sent St. George's attorney a letter, which his client also signed, stating that Nazmiyal was exercising his right of first refusal by agreeing to buy the building on the same terms as those contained in the Newport agreement.
According to Ackerman, he faxed a letter exercising Nazmiyal's right of first refusal at approximately 4:00 p.m. on November 16, 2005. Approximately half an hour later, Ackerman's office received a faxed letter from St. George's attorney confirming St. George's expectation of receiving a net amount of $4.375 million from the transaction. Ackerman testified that when St. George's counsel subsequently sent him a proposed contract setting forth the terms of the sale, the contract had several significant changes from the Newport contract, but those changes were not highlighted or otherwise disclosed. Ackerman *1093 discovered them by having an associate do a "line-by-line" comparison with the Newport contract.
Most significantly, the proposed contract unilaterally placed on Nazmiyal the obligation to pay any broker commission over $125,000, while the Newport contract contained mutual indemnifications against claims by undisclosed brokers with whom either party had dealt. According to both Nazmiyal and Ackerman, Nazmiyal would not sign the contract without an explanation from St. George as to what, if any, additional broker commissions the clause required Nazmiyal to pay. St. George refused to answer the question, and Nazmiyal was unwilling to undertake an undisclosed additional financial obligation, which Newport had not been required to pay. Accordingly, on November 22, 2005, Ackerman faxed a letter to St. George's attorney rejecting the contract containing St. George's unilateral changes, and expressing concern that St. George might be trying to require Nazmiyal to pay Pivnick's share of the commission. Ackerman offered to have his client sign a version of the contract with precisely the same provisions as the Newport contract.[4]
According to Nazmiyal, about two or three weeks after the dispute over the proposed revised contract, he learned that in 1999, St. George had signed an agreement guaranteeing Brothers a five percent commission if a tenant purchased the property, and that Brothers was insisting on the five percent commission, which amounted to $225,000, if Nazmiyal bought the property. The reason Brothers had been willing accept a $125,000 commission on the Newport deal was that the Nazmiyal lease required Brothers to share half his commission with another broker, Pivnick, whereas if Newport bought the building Brothers would keep the entire commission. Brothers was not willing to take a lower commission if he had to split it with Pivnick. Thus, the purpose of the disputed clause in the proposed sale contract was to require Nazmiyal to pay the difference between the $125,000 Brothers had agreed to accept in the Newport contract and the additional amount of commission due if Nazmiyal bought the property. This was unacceptable to Nazmiyal.
David Pivnick provided additional testimony concerning the lease and the ensuing controversy. According to Pivnick, Brothers introduced him to Clark in the spring of 1995, and Clark hired Pivnick's company to manage the property. Pivnick managed the property for St. George from 1995 to May 1999. Part of that responsibility included drafting leases for all the tenants in the building. Pivnick testified that he and Clark became close friends. Although Pivnick also knew Nazmiyal, he had a much closer relationship with Clark than with Nazmiyal. According to Pivnick, he brought Nazmiyal to Clark as a potential purchaser for the building, and then as a potential tenant. Pivnick testified that when he prepared the initial lease between Nazmiyal and St. George, he did so at Clark's direction. Even though Pivnick was no longer managing the property at the time, Clark asked him to prepare the lease. According to Pivnick, he included the initial clause requiring the tenant to pay the broker's commission, at Clark's request. Pivnick then provided a copy of the draft lease to Clark and to Nazmiyal's attorney, for their review.
Pivnick testified that he was not involved in negotiating the terms of the *1094 lease. He was acting as the drafter, "at the direction of the landlord, Mr. Clark." However, later in his testimony, he described himself as a "dual agent" acting on behalf of both parties. Pivnick had no specific recollection as to how the "tenant pays commissions" clause came to be removed from the lease; since he was acting "at the request and direction of Mr. Clark," his "best guess" was that during negotiations with Nazmiyal, Clark had agreed to remove the clause and had so directed Pivnick. Pivnick later specified that Clark directed him to remove that provision, but he was unable to say why Clark gave him that direction. Pivnick also did not know why Clark did not direct him to specify who would pay the commissions.
With respect to Pivnick's entitlement to a commission if Nazmiyal bought the property, Pivnick testified that he knew that Brothers had a pre-existing agreement with St. George for a five percent commission if a tenant purchased the property. Pivnick understood that if Nazmiyal bought the property, Brothers would split that commission with him. According to Pivnick, he knew that Brothers had agreed to a reduced commission if Newport bought the property, but Pivnick and Brothers had no discussions and no agreement about a reduced commission if Nazmiyal bought the property.
However, when Pivnick heard that Nazmiyal intended to exercise his right of first refusal, Pivnick told Clark that he would be willing to accept "the same amount of commission that Mr. Brothers would be getting." In that context, Pivnick indicated that he would accept half of the $125,000 commission, although he and Clark both knew that Brothers would not be willing to split that money with him. At that point Clark told Pivnick that he would talk to his partners about "throwing some more money into the commission pool" to try to resolve the issue. Ultimately, even though Pivnick would have been satisfied with a $62,500 commission, Brothers was unwilling to accept less than a $125,000 commission and St. George was not willing to pay anything more.
Pivnick explained that he did not expect Nazmiyal to contribute to his commission because "it is not the standard typically in the business that a buyer pays a commission. It is typically paid by a seller." Pivnick also knew that the lease provision that would have required Nazmiyal to pay commissions had been removed, and the Newport sale agreement, which Nazmiyal was matching, did not require the buyer to pay commissions.[5]
Significantly, in response to the judge's questions, none of the other sophisticated business persons and attorneys involved on the St. George-Nazmiyal side (Brothers, Nazmiyal, Clark, and Ackerman) could explain why they had not made a greater effort to work out what amounted to a $62,500 commission claim in order to save this multi-million dollar deal and avoid costly litigation. According to St. George's attorney, Douglas Stevinson, as soon as Newport's attorney sent him a letter on November 23, 2005 threatening litigation if St. George sold the property to Nazmiyal, St. George discontinued any effort to resolve the deal with Nazmiyal; they prepared instead to file this declaratory judgment action.
With respect to Nazmiyal's ability to close the deal after he exercised his right of first refusal, Nazmiyal presented testimony *1095 from Paul Ciancimino, Senior Vice-President of Commercial Lending of Atlantic Bank (Atlantic), establishing that Nazmiyal was ready, willing and financially able to purchase the property. According to Ciancimino, Atlantic had previously financed Nazmiyal's purchase of several other commercial properties.
Nazmiyal first contacted Ciancimino in April 2005 about his interest in buying the property.[6] Both Ciancimino and his immediate supervisor were supportive of the purchase. In the fall of 2005, Ciancimino visited the building, and obtained both an appraisal and an engineering report on the property. He knew Nazmiyal needed to close in November. According to Ciancimino, by November 18, 2005, the bank had committed to lending Nazmiyal $3.45 million toward the purchase price of the property. Nazmiyal and his partner Fred Ostad signed the commitment letters in Ciancimino's office on November 21, 2005. By November 29, 2005, the underwriting conditions had been satisfied, which meant that the bank was prepared to close on the loan.
In fact, according to Ciancimino, he not only knew and had faith in Nazmiyal, he also had been friends with one of St. George's principals, George Zoffinger, for thirty years. Accordingly, in late November, Ciancimino called Zoffinger and assured him that Nazmiyal would be able to close the deal:
I said "Look, don't let there be any concern about financing. I'm here behind Jason. He is a client of mine. He is a good guy and we are going to get this done."
According to Ciancimino, Atlantic Bank was able to close quickly for a good customer such as Nazmiyal. In fact, he testified that the bank had in the past closed a transaction in as short a time as five days. In this case, Ciancimino knew the deal needed to close quickly, and that was why he called Zoffinger to reassure him that Nazmiyal would have the necessary financing.
In response to the court's question, Ciancimino testified that the bank was still willing to finance the purchase and would do so "right now" if the court granted specific performance. He also testified that in November 2005, Nazmiyal had approximately $1.5 million in his business account; thus, with the Atlantic loan, he had more than enough funds to close the deal. Further, because of their prior business relationship, Ciancimino had authority to waive the requirement that all of Nazmiyal's business partners guarantee the loan, as long as Nazmiyal himself and his principal partner Fred Ostad signed a guarantee protecting the bank in case of fraud or bankruptcy. In their testimony, Nazmiyal and his attorney, Bruce Ackerman, also both confirmed that Nazmiyal had the necessary financing to close the deal.

II
Based on the trial evidence, the judge issued a twenty-four page written opinion. He found that Brothers was St. George's broker. Brothers had a written agreement with St. George, which provided that St. George would pay Brothers "a 5% commission on the gross sales price if any *1096 tenant, produced by Brothers, ultimately purchases the Property." The judge found that Brothers introduced Pivnick to St. George, who in turn hired Pivnick to manage the building. In that capacity, Pivnick had drafted about a dozen leases for St. George.
Although Pivnick and Nazmiyal were friends, and Pivnick had introduced Nazmiyal to the property in 1999, the judge found as fact that Pivnick drafted the St. George-Nazmiyal lease "[a]t the request of [St. George]" and "on behalf of [St. George]." Nazmiyal retained his own attorney to review the lease. These factual findings were consistent with Pivnick's testimony, which the judge evidently found credible.
The initial draft of the lease required Nazmiyal to pay the sales commission in the event that he purchased the property pursuant to the right of first refusal clause. However, the judge found that, based on Nazmiyal's objection, the "tenant pays" provision was removed from the lease.[7] Thus, removing the clause left in place the agreement between Brothers and St. George, which required St. George to pay Brothers' commission in the event of a sale.
On the issue of Nazmiyal's ability to close on the property within the time frame and on the terms Newport's offer proposed, the judge credited the undisputed testimony of Nazmiyal and Ciancimino, that Nazmiyal had the necessary financing to close on the building within the required time frame. He accepted Ciancimino's testimony that "the bank considered Mr. Nazmiyal a preferred customer and, as such, the Bank was willing to go out of its way to help him make the deal." Hence, the judge found that "Mr. Nazmiyal was ready, willing and able to close."
The trial judge found the essential facts concerning Nazmiyal's invocation of the right of first refusal as follows: "[St. George] notified Nazmiyal by letter dated October 17, 2005 that it had received a bona fide offer to purchase which was acceptable," and "indicated it intended to accept the offer unless Mr. Nazmiyal notified [St. George] within 30 days" that he elected to purchase. Nazmiyal responded with a letter "dated and delivered November 16, 2005" that he unconditionally elected to purchase the property "at the same price and on the same terms as offered by Newport." Since Nazmiyal unequivocally accepted the offer in writing, "a binding executory contract was created between [St. George] and Mr. Nazmiyal" immediately upon his exercise to his right of first refusal. The judge found that St. George acknowledged the creation of this contract "in a letter dated November 18, 2005."
The judge further concluded that St. George's separate letter "attempting to highlight that it anticipated receiving 'net consideration' of $4,375,000 has no bearing upon the enforceability and effectiveness of Mr. Nazmiyal's exercise of the right of first refusal." Rather, Nazmiyal's payment obligation was "governed by the language of the right of first refusal" and "not an amount that [St. George] unilaterally sought to assert." In that regard he noted that as a matter of law, the contract arose from the parties' respective offer and acceptance, and that their "common intention" was "manifested `outwardly,' not by some unexpressed or secret, unilateral intent." That is, St. George's *1097 "expectation" as to a net recovery was not stated in the Newport-St. George contract.
The judge concluded that the lease gave Nazmiyal the right "to purchase the Property for the same consideration contained in the Newport offer. There is no obligation for Mr. Nazmiyal to pay more." In addition, the judge concluded that the first-refusal clause of the lease did not "require a guarantee that [St. George] receives the same net consideration." He found that any reduction in the net amount St. George would ultimately receive was "due to the self-imposed obligations of [St. George], negotiated by [St. George] or its agents."
Turning to the question of what constituted Nazmiyal's acceptance "at the price and on the terms" set forth in Newport's October 12, 2005 offer, the judge reasoned that the relevant term was the stated purchase price, not the net amount the seller would receive. In reaching that conclusion, the judge accepted the reasoning of the Rhode Island Supreme Court in Kenyon v. Andersen, 656 A.2d 963, 966 (R.I. 1995). He concluded that "[t]he consideration due from Nazmiyal is governed by the language of the Lease and the October 12, 2005 Offer, not what [St. George] unilaterally anticipates." In a related point, he concluded that the lease, Newport's October 12, 2005 offer, and Nazmiyal's November 16, 2005 letter notifying St. George of his acceptance, constituted the contract of sale between Nazmiyal and St. George; Nazmiyal was not obligated to sign a "new" or separate contract with St. George in order to purchase the property.
The judge also reasoned that the commission issue on which the deal foundered was a problem created by St. George:
[St. George], not Nazmiyal, negotiated the terms of the third-party offer with Newport. [St. George] could have protected itself in any number of different ways, but it did not. It was [St. George] who created the brokerage commission issue. Nazmiyal should not be required to bear the burden of St. George's obligations.
Addressing the five percent broker's commission due to Brothers, the judge found that the lease obligated Nazmiyal to pay the same consideration "contained in the bona fide offer," i.e., $4.5 million. However, the lease obligated St. George to pay the commission. He found that St. George "created the 5% [commission] obligation should Nazmiyal purchase." He also reasoned that St. George "agreed to pay all commissions due in the Newport Agreement from the $4,500,000 sale price; it is legally obligated to do the same for the Nazmiyal purchase." He therefore required St. George to pay Brothers a $225,000 commission, which, pursuant to the lease, Brothers would split with Pivnick.
Addressing the appropriate remedies, the judge determined that Nazmiyal was entitled to specific performance; that none of the parties was entitled to counsel fees under the Newport-St. George contract; that Brothers and Pivnick were entitled to their commissions; and that the parties' remaining damage claims were moot.

III
The trial court's factual findings are binding on appeal so long as they are supported by substantial credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). We owe particular deference to the court's credibility determinations. State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999). Having considered the trial record in light of those well-established principles, we conclude there is ample credible evidence to support the judge's factual finding that Nazmiyal had the necessary financing and was ready, *1098 willing and able to close on the property. In that regard, we find no basis to interfere with the trial judge's decision to credit the testimony of Nazmiyal's banker, Ciancimino.
We turn next to the central issue in the case: whether Nazmiyal effectively invoked the right of first refusal. In deciding that Nazmiyal had no obligation to offer more than $4.5 million to buy the property, the judge relied on factual findings which we conclude are amply supported by the record. Rova Farms, supra. We also agree that the judge reached the correct result in a well-reasoned decision. We add the following discussion.
A right of first refusal is
"not a true [purchase] option but ... a valuable prerogative. It limits the right of the owner to dispose freely of his property by compelling him to offer it first to the party who has the first right to buy. Nor may the owner accept an offer made to him by a third party." [Mazzeo v. Kartman, 234 N.J.Super. 223, 229, 560 A.2d 733 (App.Div.1989) (quoting 11 Williston on Contracts § 1441A, at 948-50 (Jaeger ed., 3d ed. 1968))].
The right may vary depending on the way the parties structure it. "A contract granting a right of first refusal may take various forms, including the type at issue here which contemplates a bona fide third party offer as the triggering event." Ibid. Thus, the price is not defined in the right-of-first-refusal clause, but rather is defined in the third party's offer or "`by the terms on which [the owner] has expressed a willingness to sell.'" Id. at 230, 560 A.2d 733 (quoting 1A Corbin on Contracts § 261, at 470 (2d ed. 1963)).[8]See also 3 Corbin on Contracts § 11.3 (Perillo rev. ed. 1996).
As illustrated by our decision in Mazzeo, supra, 234 N.J.Super. at 230-31, 560 A.2d 733, the terms of a right of first refusal are to be construed employing the same rules of construction applicable to any other type of contract. See also Guaclides v. Kruse, 67 N.J.Super. 348, 355-57, 170 A.2d 488 (App.Div.), certif. denied, 36 N.J. 32, 174 A.2d 658 (1961).
Our courts hold to the view that the construction to be adopted of a written instrument like the agreement of first refusal here in question is the one "which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end."
[Wellmore Builders, Inc. v. Wannier, 49 N.J.Super. 456, 466, 140 A.2d 422 (App. Div.), certif. granted, 27 N.J. 320, 142 A.2d 710 (1958) (quoting Krosnowski v. Krosnowski, 22 N.J. 376, 387, 126 A.2d 182 (1956)).]
We also conclude that those rules of construction are equally applicable to the third-party offer which the right-holder must match. Most pertinent is the rule that, where the non-drafting party has no opportunity to negotiate the terms of a contract, ambiguities will be construed against the drafter. See Kotkin v. Aronson, 175 N.J. 453, 455, 815 A.2d 962 (2003); Wakefern Food Corp. v. Liberty Mutual Fire Ins. Co., 406 N.J.Super. 524, 538-40, 968 A.2d 724 (App.Div.2009). Where, as will normally be the case, the contract *1099 between the seller and the third-party offeror is structured by those parties with no input from the right-holder, it is appropriate to apply the rule in favor of the right-holder.
That is particularly so where the third-party, in this case Newport, is clearly aware of the right of first refusal and both the third-party and the seller structure their contract with an eye to its impact on the right-holder. It is, for example, clear that Newport made what it considered a "strong offer," including an all-cash payment with a very short closing deadline, in the hope that Nazmiyal would not be able to match its terms. St. George apparently wanted to limit its obligation to pay brokers' commissions and attempted to structure the Newport contract to protect that interest. However, we agree with the trial judge's conclusion that St. George did not succeed in that effort.
The trial judge concluded that the agreement between Nazmiyal and St. George "is subject to only one interpretation; Mr. Nazmiyal must pay the same amount that Newport agreed to pay, $4,500,000. It doesn't require that Mr. Nazmiyal pay more nor does it require a guarantee that [St. George] receives the same net consideration." In that context, the trial court also adopted the following language from Kenyon v. Andersen that, "it is the purchase price and not the net amount to be received by [the seller] which define[s] the terms under which the right [of first refusal] could be exercised." Kenyon, supra, 656 A.2d at 966.
In Kenyon, it was the buyer who attempted to argue otherwise, contending that he could subtract the broker commission which the seller would have had to pay under the third-party offer, and only offer the seller the net he would receive under that contract. In that context, the Rhode Island Supreme Court held that the seller was entitled to insist that the right-holder match the purchase price in the third-party offer, not the net amount the seller would receive under that contract. We agree that, absent language to the contrary in the right of first refusal or parol evidence to the contrary, that is a fair construction, consistent with the parties' reasonable expectations. Otherwise, the right would inevitably be rendered ambiguous, allowing the right-holder to attempt to subtract from his offer all sorts of costs the seller might hypothetically incur in connection with the third-party offer. Moreover, where the right is worded in terms of matching an "offer" the seller finds acceptable, the focus is logically on what the third-party offers, not on what the seller will receive.[9]
On the other hand, the seller and the third-party may structure the "offer" so that it encompasses something more than a gross purchase price. If the net compensation is a critical term for the seller, we perceive no reason why the seller and the third-party may not clearly and unambiguously structure their contract to require that the seller must receive a certain net compensation, so long *1100 as the right of first refusal was also worded with sufficient clarity to put the right-holder on notice that it could be obligated to meet a price term other than solely a gross purchase price. See Fallenius v. Walker, 787 P.2d 203, 205 (Colo.Ct.App. 1989) ("`The option clause of the lease did not provide the "best bona fide offer net to lessor."'... Rather, the optionee was entitled to exercise his right to purchase only if he met the same terms and conditions as the `best bona fide offer' received by the seller." (quoting Culley v. Grand Junction Legion Bldg. Corp., 138 Colo. 254, 331 P.2d 514, 516 (1958))); Reef v. Bernstein, 23 Mass.App.Ct. 599, 504 N.E.2d 374, 376 n. 5 (1987) (quoting a properly-drafted right of first refusal clause guaranteeing the seller a net amount).
In this case, the right of first refusal was worded so as to require Nazmiyal to match "the price, terms and conditions" of the third-party offer. In the Newport agreement, St. George agreed to accept a $4.5 million purchase price and agreed to pay the broker's commission. Neither the right of first refusal clause nor the Newport contract was unambiguously worded so as to require Nazmiyal to make an offer that guaranteed St. George a certain net price or to pay brokers' commissions. Nor is there any evidence that Nazmiyal and St. George negotiated for those terms. To the contrary, in the right of first refusal, St. George specifically agreed to remove a clause that would have required Nazmiyal to pay brokers' commissions if it bought the property. Under these facts, there is no basis to infer that the parties intended that Nazmiyal would pay commissions in addition to matching a third-party offer.
Further, we agree with the trial judge that, in the absence of a specific contract provision so providing, St. George's unexpressed, unilateral intent to receive a certain net price cannot bind Nazmiyal to pay a higher price for the property. See Brawer v. Brawer, 329 N.J.Super. 273, 283, 747 A.2d 790 (App. Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000); Cohen v. Meola, 37 Conn.Supp. 27, 429 A.2d 152, 154 n. 1 (Super.Ct.1980). Newport is correct that "the owner of the assets subject to the right of refusal remains master of the conditions under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat preemptive rights." Seessel Holdings, Inc. v. Fleming Companies, Inc., 949 F.Supp. 572, 576-77 (W.D.Tenn.1996). However, this does not entitle the owner to retroactively amend the terms of the right of first refusal, nor to engraft upon the third-party offer additional terms more onerous to the right-holder.
The judge did not specifically address the clause in the Newport contract requiring that if either party dealt with a broker other than Brothers, that party would be obligated to pay any commission due to that other broker. On this appeal, St. George contends: (a) the clause was one of the "terms" Nazmiyal had to accept in order to invoke the right of first refusal, (b) Nazmiyal's purchase of the property triggered Pivnick's right to a commission, and therefore (c) because Nazmiyal "dealt" with Pivnick, Nazmiyal must pay the $112,500 commission due to Pivnick. We disagree.
First, it is far from clear that the "dealt with another broker" clause was intended as a "term" that Nazmiyal had to accept to invoke the right of first refusal. As between Nazmiyal and St. George, the clause is ambiguous and as such would be construed against St. George, since Nazmiyal had no part in drafting that clause. See Kotkin supra, 175 N.J. at 455, 815 A.2d 962. As the trial judge correctly noted, if *1101 St. George's wanted to protect its right to receive a net sum from the sale, it could have done so, but it did not. See Reef, supra, 504 N.E.2d at 376 n. 5.
Perhaps, if St. George and Newport had intentionally drafted the clause as a sort of "poison pill" designed to prevent Nazmiyal from invoking his right of first refusal, the clause might have been inconsistent with St. George's obligation of good faith and fair dealing under its agreement with Nazmiyal. See Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224-25, 864 A.2d 387 (2005); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420-21, 690 A.2d 575 (1997). See also Wellmore Builders, supra, 49 N.J.Super. at 467, 140 A.2d 422; W. Tex. Transmission, supra, 907 F.2d at 1566. However, it appears on this record that the clause was standard boilerplate, designed to protect each party against claims by undisclosed brokers,[10] and the $125,000 commission recited in the Newport agreement simply reflected Brothers' willingness to take a lower commission if he did not have to share with Pivnick.
Further, we conclude that the clause would not require Nazmiyal to pay more than $4.5 million even if the clause applied to Nazmiyal's purchase of the property. St. George's October 11, 1999 agreement with Brothers obligated St. George to pay a five percent commission to Brothers if a tenant bought the property. The 1999 agreement did not obligate St. George to pay a broker other than Brothers, even if Brothers had separately agreed to share its commission with Pivnick. Thus, St. George's obligation to pay Brothers $225,000, as a result of a sale to Nazmiyal, arose from St. George's dealings with Brothers and not from its dealings with another broker. The fact that Brothers was willing to take a lower commission if Newport bought the property is likewise irrelevant for purposes of the "dealt with another broker" clause.[11]
In the context of this case, the clause in the lease requiring Pivnick and Brothers to split the sales commission fifty-fifty, if Nazmiyal bought the property, is a red herring. That clause memorialized Brothers' obligation to split his five percent commission with Pivnick, not Nazmiyal's obligation to pay Pivnick a separate commission. Although Brothers and Pivnick had no separate written agreement to split the commission, it was clear from Brother's testimony that this was the established practice in the industry, and Brothers had no objection to splitting with Pivnick the five percent commission guaranteed to Brothers in the 1999 agreement.
Moreover, it is clear from the undisputed testimony concerning the standard practice in the real estate industry that, absent an agreement otherwise, the seller was responsible to pay the brokers' commissions. Therefore, when Nazmiyal successfully insisted on removing the lease clause requiring him to pay the broker's commission, St. George remained responsible for paying Brothers a five percent commission, as provided in its pre-existing 1999 agreement with Brothers. In turn, according to the lease, that commission would be split with Pivnick.

*1102 IV
The parties' remaining arguments on the appeals and cross-appeals, including claims for counsel fees and damages, are without merit and warrant no discussion, beyond the following comments. R. 2:11-3(e)(1)(E). We agree with the trial judge that the lease, the Newport contract, and Nazmiyal's letter agreeing to match the Newport contract, constituted a binding contract. However, we find St. George's argument on this point to be without merit for another reason. Nazmiyal's counsel unambiguously indicated his client's willingness to sign a contract for the sale of the property, provided it had the same terms as the Newport contract. He was simply unwilling to sign a contract requiring him to pay more than Newport had offered.
We find no error in the trial judge's decision to deny the parties' various applications for counsel fees. We appreciate and join in the judge's comments throughout the trial that all parties other than Newport could have readily resolved their disputes by conducting good faith negotiations over what then amounted to a $62,500 commission claim. During the trial, they admitted that this would have been the better course. Unfortunately, instead of resolving their differences, they spent a fortune in litigation expenses. We find no abuse of discretion in the judge's determination that counsel fees should not be awarded here.
Affirmed.
NOTES
[1] In this opinion, where a corporation is wholly-owned by an individual, we use the individual's last name to refer to both. This usage is consistent with the manner in which the parties dealt with each other.
[2] In fact, by letters dated November 28, 2005 and December 5, 2005, Brothers reminded St. George's attorney that pursuant to the 1999 commission agreement, Brothers was entitled to a five percent commission, and if Nazmiyal bought the property, the commission would be split "50/50" with Pivnick.
[3] The $125,000 commission to Brothers was based on a March 14, 2005 letter from Brothers to Clark, in which Brothers had agreed to accept a $125,000 commission if the property was sold to "Domenic DePiero or any entity in which he has an interest"; the latter included Newport. In his trial testimony, Clark admitted that when he negotiated the reduced commission with Brothers, he did not negotiate what commission would be due if Nazmiyal exercised his right of first refusal. He later testified, however, that in forming his understanding that his commission obligation was capped at $125,000, he relied on an October 23, 2005 e-mail from Brothers stating that "we want to limit the commission payable by you if [Nazmiyal] exercises his option." Brothers' explanation of this e-mail was that he was simply acknowledging Clark's interest and urging Clark to word the Newport contract in a way that would limit St. George's commission obligation if Nazmiyal matched the Newport offer.
[4] By letter dated November 23, 2005 and faxed to Nazmiyal and St. George, Newport's counsel contended that Nazmiyal could not exercise the right of first refusal because he had waived the right. At that point, there is no dispute that all parties knew there was going to be litigation over the property.
[5] Pivnick also testified that in his considerable experience in the real estate business, in a right of first refusal, the well-understood meaning of the term "price," that must be matched by the right-holder, is the gross price offered by the other buyer, not the net price to the seller.
[6] Newport first made an offer to purchase the property in April 2005. However Nazmiyal contended that it was not a good faith offer, and Newport did not pursue the purchase at that time. At the trial, Newport's counsel conceded that his client and St. George had withdrawn any claim premised on Newport's April purchase offer. However, the offer put Nazmiyal on notice in April 2005 that someone else was interested in buying the property.
[7] The record amply supports the finding that the parties agreed to delete the "tenant pays" clause. We have reviewed the "redlined" version of the lease that Pivnick sent to Clark for his review. That version clearly contains a "carat" marking showing that material was deleted from the clause dealing with broker's commissions. We find no support for St. George's contention that Pivnick unilaterally altered the lease.
[8] See also W. Tex. Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1562 (5th Cir.1990), cert. denied, 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991)(footnote omitted): "The details of a particular preemptive right depend upon the contract between the parties. The terms of those contracts vary widely, and courts must scrutinize the parties' language to ascertain the scope of the preemptive right. 1A Corbin on Contracts § 261 (1963)."
[9] By contrast, where the owner and the right-holder clearly do intend to define the price as net of real estate commissions, their agreement will be upheld against an objection by the third-party purchaser. "[W]hen the only material difference between the triggering offer and the offer proposing to exercise the right of first refusal is the amount of the real estate commission payable under the triggering offer but not under the offer purporting to exercise the right of first refusal, the question of whether or not the exercising offer is on the same terms and conditions as were contained in the triggering offer should be determined on the basis of the reasonable expectations of the parties." C. Robert Nattress & Assocs. v. Cidco, 184 Cal.App.3d 55, 229 Cal. Rptr. 33, 43 (1986); Reef v. Bernstein, 23 Mass.App.Ct. 599, 504 N.E.2d 374, 376-77 (1987).
[10] In fact, paragraph 28.19 of the Nazmiyal-St. George lease contains a similar "no other broker" clause.
[11] We do not agree with St. George's contention that Pivnick's removing the "tenant pays the broker commissions" clause rendered the lease ambiguous. Removing that clause, at Nazmiyal's insistence, left in place the usual rule that the seller was responsible for paying the commissions. That well-understood rule of the real estate industry was established on this record by undisputed testimony from Nazmiyal, Brothers and Pivnick.