2015 VT 33

## SKI, Ltd. v. Mountainside Properties, Inc.

[114 A.3d 1169]

No. 14-001

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed February 6, 2015

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Christopher D. Roy* of *Downs Rachlin Martin PLLC*, Burlington, for Plaintiff-Appellee/Cross-Appellant.

*Peter H. Banse* of *Banse & Banse, P.C.*, Americus, Georgia, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Robinson, J.** This appeal concerns the parties' respective rights and obligations arising from a contract for the sale of land from SKI, Ltd.'s predecessor-in-interest to Mountainside Properties, Inc. The contract included a "right of first offer" (ROFO) with respect to an adjacent parcel. Mountainside appeals a declaratory judgment of the trial court concluding that the terms of the ROFO provision constitute an unlawful restraint on alienation. SKI cross-appeals the trial court's judgment that the offer that it made to Mountainside pursuant to the ROFO violated the covenant of good faith and fair dealing implied in the agreement, and that it therefore was not free to sell the property to another buyer on the terms offered to Mountainside upon Mountainside's rejection of the offer. Both parties argue that the trial court erred in proposing an offer by SKI to Mountainside on alternative terms which the court concluded would satisfy the requirements of the ROFO while avoiding an unlawful restraint on alienation. We affirm in part and reverse in part.

¶ 2. The relevant facts, as found by the trial court, are as follows. This case begins with the 1988 purchase and sale agreement between Mountainside (a Vermont corporation), and Killington, Ltd., a former subsidiary of and predecessor-in-interest to SKI (a Delaware corporation). At the time, Killington, Ltd. owned the Killington Ski Area. Mountainside purchased thirty-three acres from Killington, Ltd. for the purpose of residential development. At the time, Mountainside also wanted to purchase the adjoining sixty-two acre tract, but the Killington, Ltd.-owned sewage-treatment facility which provided service to the area lacked sufficient capacity to serve the homes that Mountainside intended to build on that parcel.[2] Given the limited sewage capacity, Mountainside purchased the thirty-three acres and negotiated a ROFO on the remaining sixty-two acres; it hoped to be able to purchase the remaining acreage when Killington, Ltd. had more sewage capacity.

¶ 3. Accordingly, in § 6(e) of the 1988 purchase and sale agreement for the thirty-three acres, the parties agreed, with respect to the sixty-two acre parcel, as follows:

> Seller grants Purchaser the option to purchase, at market value as determined by Killington, Ltd., the adjacent [sixty-two acre] parcel of land . . . when and if Seller in its sole discretion decides to sell such parcel, together with sufficient off-site sewage disposal rights to provide sewage disposal to the designed number of dwelling units thereon as determined by Killington, Ltd. If Purchaser fails to exercise this option within thirty days of receipt of a written offer, Seller may sell said land and sewage disposal capacity to others at the stated price or more, but shall not thereafter sell said land and sewage disposal capacity, or any part thereof, at a lesser price without first extending to Purchaser the further opportunity and time to purchase at the lower price.

The agreement provides that the seller's obligations under the agreement "shall be binding upon its successors and assigns."

¶ 4. Subsequently, Mountainside improved the thirty-three-acre parcel with connector ski trails to the Killington Ski Area, new

---

[2] The thirty-three acres and the sixty-two acres are part of a larger 400-acre planned unit development (PUD).

roads, and sewer and electrical lines. The connector trail crosses the sixty-two-acre parcel. Mountainside also drilled wells on the sixty-two acre parcel to benefit the thirty-three acres, pursuant to an easement with Killington, Ltd.

¶ 5. In 2006, Mountainside entered into negotiations with Killington, Ltd. to purchase the sixty-two acres, but the parties did not reach an agreement. Soon after these failed negotiations, Mountainside learned that Killington, Ltd. was selling off its properties. Mountainside reminded Killington, Ltd. of the ROFO on the sixty-two acres.

¶ 6. In 2007, Killington, Ltd. sold the Killington Ski Resort to three entities as tenants in common (TICs).[3] Killington, Ltd. sold the TICs all the real estate it owned — except for the sixty-two acres subject to Mountainside's ROFO. At the same time, it sold its sewage-treatment plant to the TICs. In connection with these sales, Killington did not take any steps to retain any rights for sewage capacity to serve the sixty-two acres it retained; the trial court found that there was no evidence presented as to whether there was sewage capacity available at that time. Killington, Ltd. merged into SKI, and SKI proceeded to sell or otherwise divest itself of all its assets — except the sixty-two acres. After these transactions, the TICs owned the Killington Ski Resort and the sewage-treatment plant, and SKI retained the sixty-two-acre parcel as its sole remaining asset.

¶ 7. Mountainside, through its sole owner Stephen Durkee, has been actively involved in land development in Killington since 1981. After the 2007 sale, Mountainside became interested in the TICs' development plans for the area, including the 400-acre planned unit development, and actively opposed one of their development plans. Mountainside's challenge reached this Court, and we ruled in its favor. *In re SP Land Co.*, 2011 VT 104, ¶ 28, 190 Vt. 418, 35 A.3d 1007. At the time that the trial court issued its judgment, Mountainside remained in litigation with the TICs over their development plans for the Killington area.

¶ 8. In 2012, SKI decided to sell the sixty-two-acre parcel. Because any offer to Mountainside would have to include sewage disposal rights, SKI contacted the TICs to obtain sewage rights. The TICs agreed to provide sewage capacity for eight single-

---

[3] The TICs are MTB Killington, LLC; AMSC Killington, LLC; and SP II Resort LLC. They are collectively known as Killington/Pico Ski Resort Partners, LLC.

family dwellings so that an offer could be made to Mountainside, but only on the condition that Mountainside agree not to contest any permits for the development of land by SP Land. Co. or the TICs. Accordingly, on August 30, 2012, SKI made a written offer to Mountainside for the sale of the sixty-two acres. The accompanying purchase and sale agreement set the purchase price at $390,000 and provided for sewage capacity for eight single-family dwellings. The agreement stated:

> As consideration for the allocation of the [wastewater-treatment] Rights, TICs have required the Seller, its subsidiaries and affiliates, successors and assigns including Purchaser, its subsidiaries and affiliates to agree not to contest, either directly or indirectly, any application for a federal, state or local permit for the planning and construction of improvements to the lands owned or leased by the TICs and/or SP Land Company, LLC,[4] their successors and assigns in the Town of Killington, Vermont, including, without limitations, those improvements contemplated by [four specific development projects].

In its letter, SKI indicated that Mountainside had thirty days to "exercise its option" under § 6(e) of the 1988 agreement and that if Mountainside did not accept the offer, SKI would sell the property to another party "at the stated price or more."

¶ 9. Because Mountainside was already in litigation with the TICs, it was unlikely that it would accept the "no contest" terms. The TICs represented to SKI that going forward it would be requiring the no-contest terms in any contract to provide sewage capacity.

¶ 10. Mountainside did not accept the offer and advised that it did not believe the offer complied with the ROFO because the no-contest terms were not contemplated by the ROFO. For that reason, Mountainside indicated that it would continue to treat the ROFO as "an outstanding and enforceable right."

---

[4] SP Land was the actual entity that contracted to purchase the Killington assets in 2007. It then assigned its rights to the TICs, so the TICs ended up purchasing the assets. Although the trial court did not make a finding that SP Land and the TICs are formally related, it did identify one individual who is an officer of SP Land who has also been actively involved in the TICs' development projects.

¶ 11. SKI responded that another entity controlled the sewage capacity and that SKI therefore did not control the no-contest provision. SKI indicated that because Mountainside declined its offer, Mountainside had failed to exercise its right under § 6(e) of the agreement and SKI was free to sell the property to a third party, provided that the ultimate purchase price was no less than that offered to Mountainside, and the terms no less favorable.

¶ 12. SKI subsequently found an out-of-state buyer for the sixty-two acres who was willing to purchase the property for $415,000, along with sewage capacity subject to the no-contest provision. SKI executed a purchase and sale agreement with the buyer but was unable to close the deal because Mountainside had filed a notice of its ROFO in the Killington land records and the title insurance company was unwilling to issue title insurance without resolution of the dispute over Mountainside's rights.

¶ 13. In June 2013, SKI filed a complaint against Mountainside in the superior court seeking, among other things, a declaratory judgment that SKI's offer to Mountainside had fully satisfied the terms of the ROFO.

¶ 14. In a judgment issued after a bench trial, the trial court concluded that SKI's offer to Mountainside, subject to the no-contest condition, violated the covenant of good faith and fair dealing implied in the 1988 agreement. The court explained that, although the condition was imposed by the third-party TICs, and not by SKI itself, SKI acted in bad faith by extending an offer that it knew Mountainside would reject. The court explained:

> It was never anticipated in the ROFO that Mountainside would have to give up its rights to oppose development within the Killington Ski Area, development that could affect its property, in order to exercise its rights under the ROFO. . . . There is no way Mountainside could have expected that it would have to accept this type of clause in order to exercise its rights under the ROFO.

¶ 15. In response to SKI's suggestion that Mountainside could have made a counteroffer that excluded the no-contest terms, the court responded that SKI misconstrued the nature of a ROFO, and that "[a] ROFO is not a negotiation, because the terms of the offer, itself, place[] the grantee on notice that it must accept the offer as presented or lose its rights."

¶ 16. The court went on to conclude that one consequence of its ruling on the question of whether SKI's offer complied with the

ROFO is that Mountainside can effectively prevent the sale of the property in perpetuity as long as the TICs insist on the no-contest provision as a condition of providing sewage capacity and Mountainside refuses to accept an offer that contains the no-contest condition. Since this would make the property indefinitely unsalable, the court concluded that it violates the common-law doctrine against unreasonable restraints on alienation.

¶ 17. Excluding the no-contest condition from SKI's offer, the court explained, was not an available remedy because the TICs were not parties to the action. The trial court concluded that SKI *could* satisfy § 6(e) by offering to sell the property to Mountainside for the original offer price of $390,000 without any sewage capacity. In this way, Mountainside could deal directly with the TICs to negotiate sewage capacity and directly challenge the validity of the condition. Mountainside appealed, and SKI cross-appealed.

¶ 18. Both parties challenge the trial court's legal conclusions and the scope of its declaratory judgment on appeal. Under Mountainside's view, SKI's offer did not comply with § 6(e) of the 1988 agreement, but the trial court erred in concluding that the requirement for sewage capacity is an invalid restraint on alienation. It argues that the sewage requirement of the ROFO is not only a legitimate and lawful restraint but actually promotes development of the sixty-two-acre parcel. Further, Mountainside contends that the requirement does not restrain alienability indefinitely and only delays or suspends transfer of the parcel until SKI can comply with § 6(e), pointing to the possibility that the sewage facility could again change hands or some other source of sewage capacity could develop.

¶ 19. Mountainside also challenges the trial court's conclusion that SKI could comply with § 6(e) by selling the parcel without sewage capacity for the original offer price. SKI had never made such an offer, and there was no testimony or representation to the court at trial that it wanted or intended to do so. Mountainside claims that by reaching beyond the question presented for resolution by declaratory judgment and offering an opinion on a different issue not presented by the parties, the trial court exceeded its authority. Moreover, Mountainside argues, there is nothing in the record to support the notion that the parcel would have the same market value without sewage capacity, and the development potential and marketability that comes with sewage capacity.

¶ 20. In its cross-appeal, SKI first argues that its offer complied with § 6(e) of the 1988 agreement, which supplied only limited terms. Second, SKI argues that Mountainside did not raise the covenant of good faith and fair dealing before the trial court and so waived the argument. Even assuming that it was raised below, SKI argues that there is nothing in the record to support that its offer was in bad faith. Further, SKI notes that the fact that it has found a third party willing to purchase the parcel subject to the no-contest provision demonstrates there is nothing implicitly bad-faith about the condition. Lastly, SKI agrees with Mountainside that the trial court erred in concluding that SKI could comply with § 6(e) by selling the parcel without sewage capacity. SKI argues that this conclusion is an improper advisory opinion and the court's remedy "would severely restrict SKI's right to maximize the value of this asset by selling it in the manner of its choosing designed to fetch the highest price possible in the marketplace."

## I.

¶ 21. The first issue on appeal, raised by SKI's cross-appeal, is whether SKI's offer complies with § 6(e) of the 1988 agreement. We review the trial court's interpretation of the parties' agreement de novo. *Dep't of Corr. v. Matrix Health Sys., P.C.*, 2008 VT 32, ¶ 11, 183 Vt. 348, 950 A.2d 1201. The trial court's factual findings will stand so long as they are supported by reasonable and credible evidence; we will set them aside only if clearly erroneous. *Harlow v. Miller*, 147 Vt. 480, 481-82, 520 A.2d 995, 997 (1986).

¶ 22. ■ ■ Section 6(e) of the 1988 agreement — the ROFO — created a contractual right in Mountainside to preempt another buyer in the event that SKI decided to sell the sixty-two-acre parcel. See 3 E. Holmes, Corbin on Contracts § 11.3, at 468-69 (rev. ed. 1996) [hereinafter Corbin] (explaining that transactions under generic caption of "right of first refusal" create contractual right to "preempt" another). Such preemptive rights may be triggered either when (1) an owner receives an offer from a third party and decides to sell or (2) an owner decides to offer the property for sale without first receiving an offer from a third party. *Lehn's Court Mgmt. LLC v. My Mouna Inc.*, 2003 PA Super 439, ¶ 9, 837 A.2d 504. These rights can go by many

different names, but the first scenario is typically understood to be a "right of first refusal," while the second may be referred to as a "right of first offer." *Bill Signs Trucking, LLC v. Signs Family Ltd. P'ship*, 69 Cal. Rptr. 3d 589, 595 (Ct. App. 2008). Both require, as a condition to the right being triggered, that the owner decide to sell.[5] Corbin, *supra*, at 470.

¶ 23. ■ We apply ordinary rules of construction when construing the terms of a right of first offer. See *St. George's Dragons, L.P. v. Newport Real Estate Grp., L.L.C.*, 971 A.2d 1087, 1098 (N.J. Sup. Ct. App. Div. 2009) (construing right of first refusal under standard rules of contract interpretation). "We interpret contracts to give effect to the parties' intent, which we presume is reflected in the contract's language when that language is clear." *R&G Props., Inc. v. Column Fin., Inc.*, 2008 VT 113, ¶ 17, 184 Vt. 494, 968 A.2d 286 (quotation omitted). When interpreting a contract, we "strive to give effect to every part of the instrument and form a harmonious whole from the parts." *State v. Philip Morris USA Inc.*, 2008 VT 11, ¶ 13, 183 Vt. 176, 945 A.2d 887 (quotation omitted).

¶ 24. ■ Here, § 6(e) provides that "[Killington, Ltd.] grants [Mountainside] the option to purchase . . . the adjacent parcel of land . . . together with sufficient off-site sewage disposal rights to provide sewage disposal to the designed number of dwelling units thereon as determined by [SKI]." The question is whether an offer to sell the parcel and accompanying sewage capacity conditioned on Mountainside forfeiting its ability to challenge any permit application made by the TICs or SP Land Co. complies with this provision. We conclude that it does not.

¶ 25. At the time that Mountainside entered into the contract with Killington, Ltd. (SKI's predecessor), Killington, Ltd. owned

---

[5] Preemptive rights of first refusal and first offer are distinguishable from option contracts, which give the holder of the option power to compel an owner to sell property. A right of first refusal does not give the holder the power to so compel the owner. *David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 143-44 (Md. 2007) (stating that unlike an option, the holder of a right of first refusal "'has no unqualified power to compel a sale to him or to a third person'" (quoting Restatement (First) of Prop. § 413 cmt. b (1944)). Some courts have explained that a preemptive right "ripens" into an option to purchase once the owner voluntarily decides to sell property, see *Stephens v. Trust for Pub. Land*, 475 F. Supp. 2d 1299, 1302 n.4 (N.D. Ga. 2007), or is analogous to an option subject to a condition precedent, *Bramble, Inc.*, 914 A.2d at 143.

both the parcel and the sewage-treatment facility. As the trial court found, Mountainside had originally wanted to purchase both the thirty-three-acre and sixty-two-acre parcels and the only reason it could not purchase the sixty-two-acre parcel was because Killington, Ltd. lacked the sewage capacity to serve it at that time. The record supports the trial court's finding that the ROFO did not anticipate that Mountainside would have to give up its rights to oppose development within the Killington Ski Area in order to exercise its rights. As the trial court concluded, "[t]here is no way Mountainside could have expected that it would have to accept this type of clause in order to exercise its rights under the ROFO."

¶ 26. ■ That sewage capacity is no longer available from SKI as the successor to Killington, Ltd. because SKI sold the sewage facility without retaining any capacity has no bearing on what the parties intended at the time they entered into the contract. We will not rewrite the contract, nor graft conditions onto an unambiguous contractual provision merely because the passage of time and the course of development have led the parties to positions they had not anticipated. *City of Montpelier v. Nat'l Sur. Co.*, 97 Vt. 111, 118, 122 A. 484, 487 (1923) ("The plain intention of the parties cannot be nullified by construction.").

¶ 27. SKI argues that § 6(e) supplies only limited terms and that it does not preclude SKI from imposing commercially reasonable terms beyond price and the provision of sewage capacity. SKI argues that the no-contest condition should therefore be treated like any contract term left open to determination during the course of performance. See *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 49, 582 A.2d 123, 126 (1990) (concluding that contract provision was enforceable even though it did not contain price term because it "set[] forth a definite, ascertainable method of determining the price term"); Restatement (Second) of Contracts § 33 cmt. a (1981) ("Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary.").

¶ 28. ■ We recognize that an agreement creating a ROFO need not include all the terms that will ultimately govern the details of its implementation and that certain terms of implementation are often determined in the course of performance. See Corbin, *supra*, at 482 (stating that it is not necessary that terms

of promised offer be specified in advance); Restatement (Second) of Contracts § 34(1) ("The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance."). When a contract does include specific terms, however, they will be enforced according to contract principles.

¶ 29. █ The parties here left some terms of the offer to be determined during the course of performance, including the ultimate sale price and the number of dwelling units for which sewage capacity would be available. The provision of sewage-disposal rights was not, however, left to be determined by later performance but was instead explicitly provided for in the agreement. Nothing in the ROFO suggests that the sewage rights, or the right to purchase in general, could be conditioned on a general release of a broad range of legal claims wholly unrelated to the sewage system itself and against nonparties to the contract. The provision should therefore be enforced according to its terms. See *Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 9, 177 Vt. 70, 857 A.2d 263 ("Vaguely implied conditions may not be inserted into an agreement, particularly when those conditions are inconsistent with the express language of the agreement, or when they impose a restraint on doing business." (citations omitted)); *In re New Eng. Tel. & Tel. Co.*, 159 Vt. 459, 466, 621 A.2d 232, 237 (1993) ("Where the language of a contract is clear and unambiguous, the plain meaning of the language applies.").

¶ 30. █ Most importantly, there is a difference between supplying a term omitted from the agreement but necessary for implementation and grafting a condition onto a contractual term that changes the nature of the parties' bargain. Compare *Gade v. Chittenden Solid Waste Dist.*, 2009 VT 107, ¶ 24, 187 Vt. 7, 989 A.2d 491 ("[I]n the absence of contractual terms limiting the duration of the contract, we will imply a 'reasonable time.'" (citation omitted)) with *Bramble, Inc.*, 914 A.2d at 149 (concluding that "poison pill" clause added to offer under right of first refusal "would defeat [the] purpose of Petitioner's desire to own the Property, thereby frustrating Petitioner's bargained-for equitable interest in the Property"). With some limitations, the owner of property subject to a preemptive right "remains master of the conditions under which he will relinquish his interest." *Seessel*

*Holdings, Inc. v. Fleming Cos.*, 949 F. Supp. 572, 576 (W.D. Tenn. 1996). That principle does not, however, empower the owner to retroactively amend the terms of the right. *St. George's Dragons*, 971 A.2d at 1100. Here, the no-contest provision extends to *any* land owned or leased by the TIC and SP Land Co. (including land that was not connected in any way to the 1988 agreement) and extends to the waiver of claims against entities who were not parties to that agreement.[6] Given the parties' intent at the time the agreement was made and the explicit provision for sewage capacity, we agree with the trial court that offering sewage capacity conditioned on the no-contest provision does not provide Mountainside with the benefit it reasonably expected under the 1988 agreement.

¶ 31. We therefore affirm the trial court's judgment that SKI's 2012 offer does not satisfy the requirements of the ROFO such that Mountainside's rejection of the offer frees up SKI to sell the property to someone else — although we do so for a slightly different reason. See, e.g., *In re Handy*, 171 Vt. 336, 343-44, 764 A.2d 1226, 1234 (2000) (noting that we may affirm lower court decision on any ground). Because we reach our conclusion on the basis of straightforward contract interpretation, we need not and do not consider whether the 2012 offer ran afoul of the implied covenant of good faith and fair dealing.[7]

## II.

¶ 32. Having concluded that SKI's offer with the no-contest condition does not satisfy its obligations under § 6(e), we turn now to the question of whether the ROFO, construed to require an offer that includes sewage capacity that is not conditioned on Mountainside's relinquishment of ancillary legal rights, constitutes an unreasonable restraint on alienation. The trial court concluded that it does, explaining that Mountainside can prevent the sale of the property indefinitely or for as long as the TICs insist on the no-contest condition. Our review of the trial court's legal conclusions as to the restraint on alienation is plenary. *Smith v. Desautels*, 2008 VT 17, ¶ 8, 183 Vt. 255, 953 A.2d 620.

---

[6] We do not reach the questions of whether a no-contest provision such as this one is commercially reasonable or whether this particular condition is valid.

[7] Because we do not consider the implied covenant, we need not address SKI's arguments that the trial court erred in relying on the covenant because the issue was not raised in the proceedings below, and that SKI acted in good faith.

¶ 33. Mountainside argues that the trial court erred in concluding that requiring SKI to offer sewage capacity pursuant to the ROFO would result in an unreasonable restraint on alienation. Citing this Court's decision in *R&G Properties*, Mountainside argues that the sewage requirement was a legitimate and lawful restraint on the alienation of the sixty-two-acre parcel.

¶ 34. ■■ ■■ We agree that enforcement of the parties' ROFO would not run afoul of the common-law rule against unreasonable restraints on alienation.[8] In Vermont, the reasonableness of a restraint on alienation depends on whether alienation is permitted to some alienees and whether the restraint has a " 'long-term effect on the improvement and marketability of the property.' " *R&G Props.*, 2008 VT 113, ¶ 23 (quoting *Iglehart v. Phillips*, 383 So. 2d 610, 614 (Fla. 1980)). "Reasonableness is determined by weighing the utility of the restraint against the injurious consequences of enforcing the restraint." Restatement (Third) of Prop.: Servitudes § 3.4. In assessing the validity of a ROFO, we consider the purpose of the right, the price, and the clarity of the procedures for exercising the right. *Id.* § 3.4 cmt. f (explaining

---

[8] The parties have not raised, and we do not decide, whether the preemptive right here must also comply with the rule against perpetuities. Courts have divided over whether such preemptive rights should be tested under the rule against perpetuities rather than the common-law rule against unreasonable restraints, and disagree over the extent to which the two rules overlap. Compare, e.g., *Ferrero Constr. Co. v. Dennis Rourke Corp.*, 536 A.2d 1137, 1139-41 (Md. 1988) (choosing to follow "vast majority of courts and commentators" in holding that rule against perpetuities applies to rights of first refusal, rather than minority of courts which hold rule inapplicable, and collecting cases) with *Metro. Transp. Auth. v. Bruken Realty Corp.*, 492 N.E.2d 379, 384-85 (N.Y. 1986) (holding that "preemptive rights unlimited in duration" in "commercial and governmental activities . . . are best regulated by the rule against unreasonable restraints on alienation so that the utility of the restriction may be considered, rather than by the inflexible" rule against perpetuities, "because neither 'lives in being' nor 'twenty one years' are periods which are relevant to business or government affairs"); see also *Atl. Richfield Co. v. Whiting Oil & Gas Corp.*, 2014 CO 16, ¶ 43, 320 P.3d 1179 (noting that "the perpetuities period of lives in being plus twenty-one years" has "little relevance in the commercial arena," and focusing instead on "whether the interest at issue unreasonably impact[s] the free alienability of the property or threaten[s] to deter the owner from improving the property"); Restatement (Third) of Prop.: Servitudes § 3.3 cmt. b, Reporter's Note (2000) ("In . . . permitting the social utility of the particular arrangement to avoid invalidation [under rule against perpetuities], courts in fact are applying the rule against unreasonable restraints on alienation rather than the rule against perpetuities."). Because this issue was not raised at trial or on appeal, we do not reach it.

that rights of first refusal are valid where price is not fixed, period to exercise right is relatively short, and purpose of right is legitimate); *Stephens*, 475 F. Supp. 2d at 1312 (looking to right's purpose, price, and duration to determine its validity).

¶ 35. ██ In *R&G Properties*, this Court explained that "[r]estraints on alienation are not favored, and courts determine the reasonableness of a restraint by considering a number of factors." 2008 VT 113, ¶ 23. In that case, the borrower under a mortgage agreement argued that the mortgagor's refusal to allow partial substitution of collateral, when combined with a statute requiring notice and a waiting period before selling the collateral at issue, constituted an unreasonable restraint on alienation. *Id.* ¶ 32. This Court concluded that although the statutory requirements made it more difficult to sell the collateral, they did not render the sale impossible, and an interpretation of the agreement that did not allow for partial substitution of collateral did not therefore unreasonably restrain the collateral's alienation. *Id.* ¶ 33.

¶ 36. To begin, we note that while it is the no-contest condition that has caused the current stalemate, the proper focus for determining the ROFO's validity is on the contractual provision itself. The contract requires SKI to offer the sixty-two acres to Mountainside, including appropriate sewage capacity, before selling to another buyer at the same or a higher price. That SKI no longer controls the provision of sewage capacity may impact its remedies and defenses in the context of a breach of contract action, but it does not actually change the requirements of the ROFO.[9]

¶ 37. ██ From that perspective, the ROFO is not an unreasonable restraint on alienation. First, the purpose of the ROFO

---

[9] SKI does not raise, and we do not reach, the question of whether current circumstances would support affirmative defenses in a breach-of-contract action, such as impossibility or frustration of purpose. Such defenses would force the exploration of the circumstances surrounding SKI's conveyance of the sewage plant and the impact of SKI's failure to retain sewage capacity when it sold the facility. A party who created the circumstances that brought about the impossibility or frustration of purpose cannot raise these doctrines as defenses. E.g., *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (stating that "common-law defense of impossibility of performance against [a] claim for breach . . . is traditionally unavailable where the barrier to performance arises from the act of the party seeking discharge"); Restatement (Second) of Contracts §§ 261, 266 (duty to render performance will not be discharged unless purpose is frustrated or made impracticable without fault of party seeking discharge).

itself was to encourage development of the property. See *Edgar v. Hunt*, 706 P.2d 120, 122 (Mont. 1985) ("[I]f the circumstances suggest that the restraint was freely entered into by mutual consent as a normal incident of an equal bargaining relationship in order to promote the original transfer of the property, the scales will tip back towards the reasonableness of the restraint."); see also *Colby v. Colby*, 157 Vt. 233, 238-39, 596 A.2d 901, 903-04 (1990) (recognizing that preemptive right initially encouraged alienation rather than restraining it). Both parties agree that sewage capacity is necessary to develop the parcel and, as the trial court found, the ROFO was a valuable part of the bargain for the purchase of the adjacent thirty-three acres. Mountainside purchased the thirty-three acres hoping to one day acquire the remaining sixty-two, and it developed its property with that plan in mind. In exchange, SKI received the benefit of an immediate sale of the thirty-three acres for development, and a potentially highly motivated buyer when it did decide to sell the sixty-two acres. See *Watergate Corp. v. Reagan*, 321 So. 2d 133, 136 (Fla. Dist. Ct. App. 1975) (explaining that right of first refusal is not unlawful restraint because it provides multiple buyers when there would otherwise be only one), *overruled on other grounds by Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One*, 986 So. 2d 1279, 1285-86 (Fla. 2008).

¶ 38. ▉ Second, neither party suggests that the price term or the duration of the ROFO unreasonably restrain alienation. The price is set at "market value as determined by [SKI]" and the right is triggered only "when and if [SKI] in its sole discretion decides to sell" the parcel. SKI therefore has control of the price term and the decision to sell. Section 6(e) establishes clear procedures for exercising the right. It gives Mountainside thirty days to exercise its right once SKI has made a written offer. This practical interference with the alienability of the parcel is slight. See Restatement (Third) of Prop.: Servitudes § 3.4 cmt. c ("The standard against which the impact of a restraint is to be measured is that of the property owner free to transfer property at his or her convenience at a price determined by the market."); see also *Low v. Spellman*, 629 A.2d 57, 57 (Me. 1993) (concluding that preemptive right exercisable at fixed price and perpetual in duration is unreasonable restraint on alienation).

¶ 39. Here, the trial court rested its conclusion that alienation of the sixty-two-acre parcel is unreasonably restrained on the sug-

gestion that, due to intervening events since parties executed the ROFO, Mountainside can now, by refusing to accept the no-contest provision, effectively prevent the sale of the property in perpetuity. The conclusion that the parties' negotiating positions will not change is, however, merely speculative and imputes an unnecessary permanence into a flexible, commercial negotiation. Moreover, the trial court's only finding with respect to the condition is that it is controlled by the TICs and not by SKI. There is nothing in the record to support the conclusion that the no-contest condition is nonnegotiable, or that the parties may not agree to a sale that does not include sewage rights. Like *R&G Properties,* while the condition may have stalled the transfer of the parcel, it does not definitively preclude alienation of the sixty-two-acre parcel.

¶ 40. Given our holding that the offer containing a no-contest provision does not comply with § 6(e) and that the rule against unreasonable restraints on alienation is not violated, we reverse the trial court's ruling that SKI could comply with the ROFO by offering the parcel without sewage capacity at the initial offer price. We do so for several reasons. First, we note that both parties argue on appeal that the trial court's ruling went beyond the question presented in the declaratory judgment action. The question of whether the ROFO, under the circumstances, amounted to an unlawful restraint on alienation was before the trial court, and the trial court offered this alternative transaction as a potential way to avoid the unlawful restraint on alienation that it had identified. Whether or not the trial court's declaratory judgment went beyond the issues presented in the context of the trial court's finding of an unlawful restraint on alienation, our conclusion that the ROFO does not constitute an improper restraint on alienation renders it unnecessary to suggest a work-around at this time.

¶ 41. Moreover, the trial court made no findings and there is nothing in the record to support the conclusion that the market value of the parcel would be the same with or without sewage capacity. If anything, the trial court's findings with respect to the limited availability of sewage capacity in the Killington area and the need for such capacity to develop the parcel point the other way. A suggestion that Mountainside might be required to pay the full market price for developable property in order to exercise its rights under the ROFO to acquire property with no sewage

capacity effectively shortchanges Mountainside under the ROFO agreement for its refusal to accept a condition the court concluded it had no reason to expect when the contract was made. Because the court's conclusion is not supported by the findings, we reverse that aspect of the trial court's declaratory judgment.

*Affirmed in part, reversed in part, and remanded with instructions to enter declaratory judgment that SKI's offer to Mountainside dated August 30, 2012 does not meet the requirements of the ROFO executed by the parties in 1988.*

