Filed 04/09/25


VERMONT SUPERIOR COURT
Addison Unit
7 Mahady Court
Middlebury VT 05753
802-388-7741
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 23-CV-01214

---

Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

---

### Ruling on Middlebury's Second Motion for Summary Judgment and Governor Douglas's Rule 56(d) Motion

This case arises out of Defendant Middlebury College's decision in 2021 to remove the Mead family name from the Mead Memorial Chapel. Former Governor Mead, a Middlebury graduate himself, contributed most of the money used to construct the chapel on Middlebury's campus in the early 1900s. Following the name change, Gov. Mead's estate was reopened by the Rutland Probate Court, and former Governor Douglas was appointed special administrator, in which capacity he filed this suit claiming that the name change violates enforceable rights of the estate. Following a motion to dismiss, first summary judgment motion and renewed motion to dismiss, and amendment of the complaint, Middlebury now has filed a second summary judgment motion seeking to end this case, while Gov. Douglas argues (both in his opposition to summary judgment and in a later, separately filed Rule 56(d) "motion") that judgment would be premature, he should be permitted to engage in more discovery, and in any event the claims remaining at this point are viable.[1]

*Procedural history*

In his original March 24, 2023, complaint, Gov. Douglas asserted in substance four claims, as follows: (1) breach of contract; (2) beach of the implied covenant of good faith and fair dealing; (3) breach of conditional gift; and (4) unjust enrichment. The thrust of these claims was that Gov. Mead's substantial contribution of funds for the construction of the chapel came with strings attached, and Middlebury ran afoul of them by changing the name. On balance, Gov. Douglas wanted Middlebury's mind changed as to the name

---

[1] To be clear, Middlebury's summary judgment motion is the only one pending. In Gov. Douglas's opposition filing, in the opening paragraph, he confusingly asks the court to "DENY Defendants' motion and grant judgment as a matter of law as follows." That sentence implies that he is both opposing Middlebury's motion and requesting summary judgment in his own favor. However, the filing concludes: "WHEREFORE, Plaintiff respectfully requests that the Court Deny Defendant's Second Motion for Summary Judgment and allow Plaintiff to proceed with Discovery with regard to the claim for breach of the covenant of good faith and fair dealing and damages, which were bifurcated by the Court's prior ruling, so that Plaintiff may resume preparation for trial." No filings by anyone after this one exhibited any confusion as to whether Gov. Douglas actually intended to file a cross-motion for summary judgment. He did not.

of the chapel or, if it could not be compelled to do so, many millions of dollars as compensation.

Middlebury filed a motion to dismiss on April 28, 2023. Based on the extensive allegations of the complaint and the many documents incorporated by reference into it, Middlebury argued that there had never been any contract—the money was a gift, and the gift was not burdened by any perpetual condition as to the chapel's name. Because there was no contract, it argued, there could be no breach of the covenant of good faith in that contract. See *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208 (1993) (The covenant is an "underlying principle implied in every contract . . . that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement."). It also argued that Gov. Douglas, as special administrator, lacked "standing" to enforce any perceived restriction on the gift as only the Attorney General would have been empowered to do so. The motion did not address the unjust enrichment claim.

The court denied Middlebury's motion to dismiss on August 4, 2023. See *Douglas v. The President and Fellows of Middlebury College*, No. 23-CV-1214, 2023 WL 11877867 (Vt. Super. Ct. Aug. 4, 2023), available at https://tinyurl.com/mr2sk5ne. It declined to resolve at that time whether the circumstances properly fall under gift or contract law, but it analyzed the issues in depth and concluded: "Whether framed under contract or gift law, proof that a perpetual naming right was intended ultimately will have to satisfy an elevated standard of clarity to be enforceable." The case then proceeded to document discovery.

On April 29, 2024, Middlebury filed its first motion for summary judgment, and it renewed its motion to dismiss on the "standing" issue. On June 3, 2024, it filed a motion for a protective order to stay depositions pending the outcome of the summary judgment motion. At this point, document discovery was complete. On July 3, 2024, the court stayed depositions on the condition that Middlebury would make its then-President (who at the time was soon to leave the College for employment elsewhere) available for a deposition if or when that time should come. See *Douglas v. The President and Fellows of Middlebury College*, No. 23-CV-1214, 2024 WL 3489548 (Vt. Super. Ct. July 3, 2024), available at https://tinyurl.com/yy2zbhtw. Middlebury readily agreed, and depositions were stayed.

In its October 3, 2024, summary judgment decision, the court again declined to decide the preliminary question of whether Gov. Mead's contribution should be analyzed under gift or contract law. See *Douglas v. The President and Fellows of Middlebury College*, No. 23-CV-1214, 2024 WL 4480091 (Vt. Super. Ct. Oct. 3, 2024), available at https://tinyurl.com/2hpjsmmv. However, the court rejected the gift law claim, explaining that, even if the transaction were treated as a gift with a perpetual condition as to the chapel's name, there would have had to be a reversionary interest expressly reserved to be enforceable now, and Gov. Douglas had not unearthed any. Middlebury's "standing" argument was premised on the transaction being a gift, so the court rejected that argument as moot. As for the principal contract claim, the court also rejected it, noting

that there was no evidence of any *perpetual* naming condition at all. It did conclude that there was a naming condition of undefined duration. However, it also determined that the condition was satisfied as a matter of law by the extreme passage of time. So, there could be no breach of any contract now. The court discussed the good faith and fair dealing claim, but did not rule on it because Middlebury had not argued the substance of that claim. The court considered the unjust enrichment claim withdrawn. The court ordered the stay on depositions to continue until further order of the court.

Following this decision, there remained three issues in the case: (1) was the transaction a gift or a contract; (2) if a contract, did Middlebury breach the covenant of good faith and fair dealing; and (3) if so, what damages, if any, could Gov. Douglas be entitled to recover if there was such a breach. The court requested further briefing on the damages question.

On October 17, 2024, Gov. Douglas filed a motion to amend the complaint, by which he proposed to withdraw the gift and unjust enrichment claims with prejudice and to add claims based on promissory estoppel and equitable estoppel. The court granted that motion on November 21, 2024. See *Douglas v. the President and Fellows of Middlebury College*, No. 23-CV-1214, 2024 WL 5104327 (Vt. Super. Ct. Nov. 21, 2024), available at https://tinyurl.com/2whkvr4y.

In the amended complaint, Gov. Douglas describes the covenant claim as follows:

193. Defendant has breached the covenant of good faith and fair dealing by removing the name "Mead" from the Chapel in direct defiance of its covenant and the expectation that the College will act honestly and reasonably in the faithful pursuit of the agreed common purpose of the contract.

194. Defendant has acted in bad faith with improper motive and with wanton disregard for the rights of the Plaintiff, scapegoating a man for the college's public relations purposes and destroying the Mead family name while erasing John Mead's lifetime of accomplishments and philanthropy that benefitted the State of Vermont and its people as well as generations of Middlebury College students.[2]

The promissory and equitable estoppel claims are asserted in a conclusory fashion. The thrust of the former appears to be that Middlebury promised that the chapel would be

---

[2] The "improper motive," as alleged by Gov. Douglas, is that Middlebury removed the Mead name from the chapel to distract attention from its historical involvement in the eugenics movement in favor drawing unwarranted attention to Gov. Mead's involvement in it, which was quite limited. Middlebury deeply disagrees with Gov. Douglas's characterizations of such facts. In prior decisions, the court has not needed to enter the fray as to that matter, and this decision is no different. Nor is there any need for the court to join any broader debate about the propriety of judging historical figures by contemporary standards. Those are weighty matters about which many people reasonably feel passionately. The court takes no position in this case.

named the Mead Memorial Chapel in perpetuity and Gov. Mead relied on that. The equitable estoppel claim appears to be the same.

Gov. Douglas submitted his further briefing as to damages on the covenant claim on November 4, 2024; Middlebury filed its on December 2, 2024. In his filing, Gov. Douglas asserts: "Plaintiff claims Compensatory Damages including, but not limited to, diminution in value of benefit of his bargained-for consideration, lost time and opportunities, litigation costs and expenses, and attorneys' fees under the 'bad faith' exception to the American Rule." See *DJ Painting, Inc. v. Baraw Enterprises*, Inc., 172 Vt. 239, 246 (2001) (The "American Rule," which has exceptions, is that the "parties must bear their own attorneys' fees."). He then says he also seeks punitive damages. The filing does little to explain how a breach of the covenant, if one were found, would properly lead to any of these damages.

*Middlebury's pending summary judgment motion*

On December 2, 2024, Middlebury filed its second motion for summary judgment, which addresses all remaining claims. As to the covenant claim, Middlebury suggests that Gov. Douglas is claiming as breaches of the covenant (1) that the name of the chapel was changed, and (2) that it disparaged the Mead family name in the course of changing the chapel's name (causing reputational harm). It argues that the first alleged breach is not viable because the covenant has to depend on facts that are not strictly a breach of the contract, and the asserted contract here was to maintain the Mead name on the chapel.

As to the second asserted breach, Middlebury argues that, as a general matter, there can be no recovery for defaming a dead person. Moreover, the parties never agreed to any sort of anti-disparagement agreement, and any voluntary waiver of First Amendment rights would have had to be clear and unequivocal, contentions that Gov. Douglas does not dispute.

More generally, Middlebury notes that the purpose of the covenant is to ensure that the parties to the contract do not "undermine or destroy the other's rights to receive the benefits of the agreement," rather than to impose new terms on the contract. Middlebury objects that the court already has ruled that by the time the name was removed from the building, Middlebury had satisfied any contractual obligations it had. There were no benefits of the agreement remaining that any perceived disparagement could have undermined. In sum, Middlebury argues that the covenant claim is inappropriately untethered to the agreement the parties allegedly actually had. Finally, to the extent that the breach is premised on "improper motivations," Middlebury argues that motivations alone are insufficient to establish a breach.

As to the promissory estoppel claim, Middlebury argues that the record that did not reveal evidence of a perpetual promise as to the name of the chapel for contract law purposes does not for promissory estoppel purposes either. Even if it somehow did, it argues, there would be no injustice in not enforcing it well over 100 years later. Finally,

it argues that promissory estoppel cannot be asserted in the context of a bargained-for gift or exchange.

As to equitable estoppel, Middlebury argues that Gov. Douglas is asserting it in an identical manner as his promissory estoppel claim. It further notes that equitable estoppel can only be asserted defensively and must refer to reliance on a past or present representation, not a promise as to something in the future.

In response to all this, Gov. Douglas argues in support of all the remaining claims. He also says this:

> As the Court will recall, it has bifurcated Discovery in this case such that no Discovery has been conducted on the claim for breach of good faith and fair dealing. Consequently, Plaintiff is completely "in the dark" with regard to the actions and decision of the Defendant to strip the Mead name from the Mead Memorial Chapel. Absurdly, Defense Counsel makes the argument that Plaintiff has no factual basis to allege bad faith conduct by the Defendant. That is because we have not had the opportunity to discovery [sic] those facts nor to ask the Defendant the most basic questions such as what information was gathered, considered, or discussed, and what information was not. How was the decision made and by whom. Was Mead blatantly and intentionally used as a scape goat to divert attention away from Middlebury College, which was "all in" on teaching Eugenics for the first half of the 20th century.

> All of these questions remain; thus, it would be patently unfair and a deprivation of due process for the Court to rule on a Summary Judgment motion on the claim of breach of good faith and fair dealing, when Plaintiff has been prevented from gathering any facts or evidence, from which to establish Defendant's bad faith conduct. Instead, Plaintiff is left to make inferences and hypothesize at the Defendant's actions and motivations, including ill will and bad motive, based upon one press release and the discovery of Middlebury College's shocking half-century of Eugenics teaching, before, during, and after the Holocaust. Therefore, Defendant's motion is premature and Plaintiff requests that the Court defer judgment on the Breach of Good Faith and Fair Dealing claim, until Plaintiff has a full and fair opportunity to conduct Discovery.

In other words, he is seeking to conduct more discovery—depositions, the only form of discovery that ever was stayed—before the court rules Middlebury's motion.[3]

Gov. Douglas does further articulate the nature of the covenant claim as follows:

> The ultimate issue regarding the breach of the covenant of good faith

---

[3] The stay never extended to interrogatories.

23-CV-01214 Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

and fair dealing is whether, in light of all of the facts and circumstances, Middlebury College acted in bad faith when it erroneously proclaimed that the Mead Memorial Chapel was named in honor of John Abner Mead and then engaged in its hypocritical public relations smear campaign to scapegoat Governor Mead and use him as a subterfuge to conceal the fact that Middlebury College was literally, a Eugenicist factory, for over 50 years, "espous[ing] inhumane policies that are uniformly condemned today," and teaching Eugenics principles until years after the atrocities of the Holocaust were fully known.

Regardless of whether there was a breach of the express terms of the contract, Defendant breached the Covenant of Good Faith and Fair Dealing implicit in that contract, because Middlebury College's smear campaign against Governor Mead interfered with, completely frustrated, and caused the cancelation of Mead's essential purpose in erecting the Chapel: to memorialize his ancestors and honor them for their devotion to their Christian faith and as a symbol of the simplicity and strength of character of Vermonters. And furthermore, Defendant's breach was effectuated for a bad motive: to serve the selfish ends of the College's marketing team who used Governor Mead as a scapegoat, overemphasizing his role, and using him to create a smokescreen to obscure the vile history of Middlebury College as a racist and antisemitic institution.

He also now characterizes the contract as an agreement "to honor and symbolize the Mead ancestors who settled and brought Christianity to the valley."

As to promissory estoppel, Gov. Douglas appears to argue that this claim is supported by the same "promise" that gave rise to the contract claim, but then generally asserts that if the duration has been too long for contract law purposes, no such limit applies to the equitable formulation of the claim because the name was intended to be on the building "forever," and the court can use its equitable powers to make it so.

As to equitable estoppel, Gov. Douglas argues that it can be asserted affirmatively as a legal claim. He does not, however, clearly distinguish this claim from his promissory estoppel claim.

Middlebury then filed a reply, Gov. Douglas filed a sur-reply, and then he filed a "motion" pursuant to Rule 56(d), more formally requesting that the court resist ruling on Middlebury's summary judgment motion until he can conduct more discovery. In his sur-reply, he for the first time asserts clearly that his covenant claim is *not* based on reputational harm:

Contrary to Defendant's repeated false assertions and "spin" which seeks to mischaracterize Plaintiff's claims, Plaintiff's Good Faith and Fair Dealing claim is premised not upon harm to John Abner Mead's reputation, but upon the Defendant's actions in unfairly, dishonestly, or without

reasonable grounds, removing the Mead name under false pretenses, thereby interfering with the essential purpose of the Mead Memorial Chapel contract: to symbolize, honor and MEMORIALIZE the Mead ancestors. Plaintiff is alleging that Defendant's actions were unfair, dishonest, or without reasonable grounds, and that such actions effectively destroyed and/or voided Defendant's performance of the Contract and adherence to Defendant's Good Faith and Fair Dealing obligations.

*Gov. Douglas's request for relief under Rule 56(d)*

Rule 56(d) provides as follows: "If [the party opposing summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or to take discovery; or (3) issue any other appropriate order." This rule is a safety valve if, for example, the motion is filed before crucial discovery has been undertaken. Gov. Douglas argued that is exactly the case here in his opposition filing, though he filed no affidavit documenting the need for more discovery. Once briefing was complete, he then filed a motion requesting the same relief and supported it with an affidavit.

The court declines to defer a ruling on Middlebury's motion in favor of more discovery. The Court never "bifurcated" discovery such that "no Discovery has been conducted on the claim for breach of good faith and fair dealing." The court stayed depositions only; document discovery long has been complete. For there to be any covenant claim, there first must be a contract, the terms of which inform the viability and breadth of any covenant claim. Establishing those contract terms is foundational to any covenant claim. If there is a contract in this case, all evidence of it would appear in records around the time of its formation over 100 years ago. There are no witnesses left to testify about the matter. As articulated by Gov. Douglas, his primary intention for depositions now is to explore the private motivations of those who may have been involved in some way in the decision to change the chapel's name or who made statements about it. He does little to explain how those private motivations, whatever they may be, are essential to any viable covenant claim, and as set forth below, the court concludes that they are not. A covenant claim cannot be predicated on bad faith in the abstract; it must be grounded in the terms of the contract from which it springs.

*Procedural standard*

Summary judgment procedure is "an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Morrisseau v. Fayette*, 164 Vt. 358, 363 (1995) (citation omitted). Summary judgment is appropriate if the evidence in the record shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a); *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994) (summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of

proof at trial).  A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact.  Instead, it must come forward with evidence to establish such a dispute.  *Murray v. White*, 155 Vt. 621, 628 (1991).  Speculation is insufficient.  *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375.

The facts material to Middlebury's motion are undisputed.  As the court put it in the first summary judgment decision: "The parties take issue with certain of each other's characterizations of facts, and they draw different inferences, but the record is purely documentary, historical, and undisputed in all material respects."  *Douglas v. The President and Fellows of Middlebury College*, No. 23-CV-1214, 2024 WL 4480091, at *2 (Vt. Super. Ct. Oct. 3, 2024), available at https://tinyurl.com/2hpjsmmv.  The material facts are fundamentally the same now as they were for purposes of the first summary judgment decision.  In that decision, the court exhaustively presented the core narrative leading to the controversy between the parties.  There is no need to duplicate that narrative here.  The reader is referred to the October 3 decision for a more specific description of the facts.

*The covenant claim*

The Vermont Supreme Court very recently summarized the covenant of good faith and fair dealing in Vermont as follows:

> "An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement."  The implied covenant extends to "actions taken in fulfillment of a contract" and "actions taken in terminating a contract and winding up the contractual relationship between the parties."  Good faith and fair dealing is "[c]ontextual and fact-specific," and accordingly "is ordinarily a question of fact."
>
> To the extent that [Plaintiff's] claim for breach of the implied covenant is duplicative of his breach-of-contract claim, it cannot be sustained as a matter of law.  "Where a party alleges both breach of contract and breach of the implied covenant of good faith and fair dealing, dual causes of action are permitted only where the different actions are premised on different conduct." . . .  Although [Plaintiff] adds that the negotiations were for a higher price, simply providing the motivations for [Defendant's] alleged breach [of contract] is insufficient to establish that the two causes of action are premised on different conduct.

*Beldock v. VWSD, LLC*, 2023 VT 35, ¶¶ 52–53, 218 Vt. 144 (citations omitted).  "Generally, an implied duty of good faith and fair dealing 'is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise.'"  *Downtown Barre Development v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 18, 177 Vt. 70; see also 17A C.J.S. Contracts § 454 ("The implied covenant of good and fair dealing cannot contradict, modify, negate, or override

the express terms of a contract. Furthermore, the implied covenant or duty of good faith and fair dealing does not create rights or duties beyond those agreed to by the parties, does not supply terms to the contract the parties were free to negotiate, but did not, or interpose new obligations about which the contract is silent, even if the inclusion of the obligation is thought to be logical and wise." (footnotes omitted)).

The covenant claim is premised on removing the Mead name from the chapel and the alleged motivations behind doing that, along with any related statements that may be perceived to have "smeared" the Mead name. Assuming that this could be a viable claim, Gov. Douglas has failed to demonstrate that he could be entitled to any remedy for it. He mainly appears to seek impermissible compensation for reputational injuries, yet he expressly denies any such characterization of his claim. Otherwise, he seeks litigation costs to "right the wrong" (which would have to be something other than disparagement) perpetrated by Middlebury, damages for the "diminution in value of [the] benefit of his bargained-for consideration," and attorney fees either as damages for the covenant claim or to penalize Middlebury's asserted bad faith litigation conduct.

Other than disparagement—i.e., reputational harm—the only evident harm would appear to be the removal of the Mead name itself. It is entirely unclear how the removal of the name, at a point in time when the contract, if there was one, no longer required Middlebury to maintain it, could possibly lead to an award of litigation costs or other compensatory damages to "right the wrong." Damages for diminution in value of the benefit provided by the contract would appear to be a remedy for the breach of the contract, not the covenant. And, Gov. Douglas's claim for damages for "lost time and opportunities" goes completely unexplained.

As to attorney fees, though there can be exceptional circumstances, they generally are not awarded as part of a recovery for breach of the covenant of good faith and fair dealing absent an exception to the American Rule. See *Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 82, 179 Vt. 167; see also *Dahua Tech. USA, Inc. v. Feng Zhang*, No. CV 18-11147-RWZ, 2020 WL 829918, at *1 (D. Mass. Feb. 19, 2020); *In re New York Skyline, Inc.*, 471 B.R. 69, 89, 56 Bankr. Ct. Dec. 138, 2012 WL 1658355 (Bankr. S.D.N.Y. 2012); *TE Prods. Pipeline Co., LLC v. Rockford Homes, Inc.*, No. 2:07-CV-00673, 2009 WL 10679677, at *4 (S.D. Ohio Oct. 19, 2009); *Maestas v. Cardinal Health PTS, LLC*, No. CV 05-242 JH/ACT, 2005 WL 8163865, at *3 n.1 (D.N.M. July 18, 2005).

One exception to the American Rule applies to bad faith litigation conduct, which Gov. Douglas also relies on as a basis for an award of fees. As the Vermont Supreme Court has explained, a "court may use its equitable powers to award attorney's fees 'in exceptional cases based on the bad-faith conduct of litigants.' 'This power must be exercised with cautious restraint, however—only in those exceptional cases where justice demands an award of attorney's fees, such as where a party is unjustly forced to endure a second round of litigation.'" *O'Rourke v. Lunde*, 2014 VT 88, ¶ 33, 197 Vt. 360 (citation omitted). It is unclear what Gov. Douglas classifies as bad faith litigation conduct in this case as there is no indication of any whatsoever in the record. There is no viable path to an award of attorney fees in this case.

Apart from the failure to identify a viable remedy, the covenant claim lacks merit in substance. If there was a contract in this case, the asserted bargain struck was that Governor Mead would provide the funds used to construct the chapel in exchange for the right to have the chapel named the Mead Memorial Chapel for an indeterminate length of time. The court already has ruled that, if there was such a contract, Middlebury satisfied the naming condition at some point well before 2021, when the name was removed from the building. That is the law of the case.

To the extent that Gov. Douglas is claiming that removing the name in 2021 itself breached the covenant, that claim is duplicative of the breach of contract claim, and thus has no merit. *See Beldock v. VWSD, LLC*, 2023 VT 35, ¶ 53, 218 Vt. 144 (2023) ("To the extent that Beldock's claim for breach of the implied covenant is duplicative of his breach-of-contract claim, it cannot be sustained as a matter of law. 'Where a party alleges both breach of contract and breach of the implied covenant of good faith and fair dealing, dual causes of action are permitted only where the different actions are premised on different conduct.'" (citation omitted)).

To the extent that he claims that the contract was breached with bad motivations, bad motivations alone are insufficient to demonstrate a separate covenant claim. See *id.* ("Although he adds that the negotiations were for a higher price, simply providing the motivations for VWSD's alleged breach [of contract] is insufficient to establish that the two causes of action [breach of contract and the covenant] are premised on different conduct."); *Ferrisburgh Realty Invs. v. Schumacher*, 2010 VT 6, ¶ 26, 187 Vt. 309 ("FRI identifies no conduct distinct from that supporting the breach of contract claim; it focuses solely on Schumacher's motivation for the breach [for purposes of the covenant claim].").

More importantly, to have a viable covenant claim, Gov. Douglas first must establish that Gov. Mead's estate remained entitled in 2021 to some benefit from the contract that Middlebury's conduct in 2021 undermined. That he cannot do because Gov. Mead (or his estate) had by then received all the benefit that he could have been entitled to—naming rights for an indeterminate but by then expired duration—before the name was removed. There was no benefit left to receive. To the extent that Middlebury retained the Mead name on the chapel longer than the alleged contract required, it did so gratuitously. Perceived disparagement at some later date could not have undermined any benefit of the bargain. As such, it is clear that Gov. Douglas is using the covenant claim argue bad faith purely in the abstract or to "interpose new obligations about which the contract is silent." There was no non-disparagement agreement. There was no agreement to waive free speech rights.

Gov. Douglas also appears to be treating the fact that the chapel was conceived as a "memorial" to double as an affirmative duty on Middlebury's part to never disparage the family name (or to always honor it, as he puts it). If that were the case, then Middlebury would have breached the covenant by disparaging the Mead name even if the name of the chapel had never been changed. It also would have breached the covenant by disparaging the Mead name even if everyone agreed that Gov. Mead truly deserved it.

23-CV-01214 Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

This extrapolation has no basis in the record.

Regardless how one views removing the Mead name from the chapel or judgments about historical figures based on contemporary standards, the restriction on free speech at the heart of Gov. Douglas's covenant claim should have been agreed to by the parties if that in any way was the goal of the agreement. See *SKI, Ltd. v. Mountainside Properties, Inc.*, 2015 VT 33, ¶ 26, 198 Vt. 384 ("We will not rewrite the contract, nor graft conditions onto an unambiguous contractual provision merely because the passage of time and the course of development have led the parties to positions they had not anticipated."); see also *Kantor v. Kantor*, 379 P.3d 1080, 1090 (Idaho 2016) ("[C]ourts do not possess the roving power to rewrite contracts in order to make them more equitable." (citation omitted)); *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 897 (Del. 2015) ("An interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" (citations omitted)). There is no evidence of any such agreement in the record.

As the court remarked earlier in the litigation, it remains highly likely that neither Gov. Mead nor Middlebury's representatives, leading up to the construction of the chapel, ever harbored any expectation whatsoever that the day might come 100 years later in which the College would decide to remove the Mead name from the chapel. No doubt, at the June 1914 ceremony—"Breaking Ground for the Mead Memorial Chapel and Presentation of the Corner Stone"— Gov. Mead's 3-year-old grandson placed his Bible and the family tree dating to the original settler Colonel James Mead into a box inside the Cornerstone. There can be little doubt that, apart from merely the name of the chapel, all involved closely identified the chapel with the Meads.

Nevertheless, the record contains no evidence that the parties ever agreed to any perpetual naming condition, any sort of non-disparagement agreement, or any contract at all that possibly could have remained in force in 2021 such that its implied covenant of good faith and fair dealing could then have been breached. Middlebury is entitled to summary judgment on this claim.

*Promissory estoppel*

Gov. Douglas's promissory and equitable estoppel claims are offered as alternatives to his contract and covenant claims. The promissory estoppel claim appears to be that—if there is no contract—there at least was a promise to keep the name on the building *forever* or as long as the building exists, and Gov. Mead relied on that promise to his detriment. "Establishment of promissory estoppel requires (1) a promise on which the promisor reasonably expects the promisee to take action or forbearance of a substantial character; (2) the promise induced a definite and substantial action or forbearance; and (3) injustice can be avoided only through the enforcement of the promise." *Green Mountain Inv. Corp. v. Flaim*, 174 Vt. 495, 497 (2002); see also *Dillon v. Champion Jogbra, Inc.*, 175 Vt. 1, 10 (2002) (noting that the claim requires "a promise of

23-CV-01214 Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

a specific and definite nature."); accord *State Bank of Standish v. Curry*, 500 N.W.2d 104, 108 (Mich. 1993) ("[T]he sine qua non of the theory of promissory estoppel is that the promise be clear and definite."). "The doctrine of promissory estoppel applies 'where there is no contract, where the promise is gratuitous, and there is unbargained-for reliance.'" *Hayes v. Town of Manchester Water & Sewer Boards*, 2014 VT 126, ¶ 37, 198 Vt. 92 (2014).

The court already has ruled that if there was a promise binding Middlebury, it was for an unspecified duration, not forever or as long as the building exists, and that period expired prior to 2021. Gov. Douglas offers no cogent reason why reframing that claim under the rubric of promissory estoppel could lead to any different conclusion. The lack of any evidence of such a promise is determinative. This claim lacks merit. It is unnecessary to address the other elements.

*Equitable estoppel*

The court is unable to distinguish Gov. Douglas's equitable estoppel claim from his promissory estoppel claim; it appears to be entirely duplicative. Historically, the doctrine of promissory estoppel emerged out of the older doctrine of equitable estoppel. Promissory estoppel is equitable estoppel premised on a *promise* rather than on a *past or present representation*. 4 Williston on Contracts § 8:4 (4th ed.). One court has distinguished the doctrines as follows:

> Equitable estoppel is essentially a doctrine of waiver. . . . Promissory estoppel, in contrast with equitable estoppel, does not establish waiver but, rather, substitutes for consideration in a case where there are no mutual promises, enabling the promisee to assert a separate claim against the promisor, independent of any other claim he may have against the promisor (e. g., subrogation or misrepresentation) or another person (e. g., negligence) and, therefore, makes applicable the statute of limitations governing the time for bringing an action for breach of contract.

*Huhtala v. Travelers Ins. Co.*, 257 N.W.2d 640, 647 (Mich. 1977) (footnote omitted). Another court explains:

> Equitable estoppel involves, generally speaking, an affirmative misrepresentation of a present fact or state of facts and detrimental reliance by another thereon.
>
> Promissory estoppel, on the other hand, generally does not involve a misrepresentation but a promise by one party upon which another relies to his detriment and which the promisor should reasonably have foreseen would cause the promisee to so rely. . . . . It operates not in regard to a past or presently existing state of facts, but rather to a situation which one party promises will be true in the future.

*Tiffany Inc. v. W. M. K. Transit Mix, Inc.*, 493 P.2d 1220, 1224 (Ariz. Ct. App. 1972) (citations omitted). By asserting an equitable estoppel claim premised on a promise, Gov. Douglas has simply re-asserted promissory estoppel. Gov. Douglas's promissory estoppel claim, as set forth above, lacks merit.

Middlebury also argues that equitable estoppel, as a form of waiver, is not a legal claim; it is properly asserted defensively only. Gov. Douglas concedes that the doctrine normally is defensive in nature, but he cites one Vermont case in support of his argument that it can be asserted affirmatively as a claim: *In re Langlois/Novicki Variance Denial*, 2017 VT 76, 205 Vt. 340. In that case, a town zoning administrator told a landowner that specific development proposed by the landowner did not need a permit, the landowner relied on that representation, and the town later brought an enforcement action against the landowner for not having a permit in response to which the landowner asserted equitable estoppel based on the zoning administrator's representation that no permit was needed for his new pergola. That is the traditional defensive assertion of equitable estoppel, not an assertion of equitable estoppel itself as a legal claim for relief.

<u>Order</u>

For the foregoing reasons, Gov. Douglas's Rule 56(d) motion is denied, and Middlebury's motion for summary judgment is granted.

SO ORDERED this 9th day of April, 2025,

_____
Robert A. Mello
Superior Judge